Good afternoon, Your Honor, and may it please the Court. My name is Keith Hilsendecker. I'm an assistant federal public defender in Phoenix and I represent the defendant, Levian Pacheco. In this appeal, Mr. Pacheco asks the Court to do three things. First, let's just... Excuse me, Counselor, it's very hard to hear you. Can you be a little louder? Yes. Is this better, Your Honor? Yes, it is. Thank you so much. You were saying that the main issue is this question of official detention and federal jurisdiction over the case. Yes, that's the issue we'd like to talk about first. And then after that, I'd like to talk about the HIV sentencing issue and the request for reassignment. And then last, I'd like to talk about the Dahlberg issue. Well, okay. We'll see what time allows. I'm going to try and watch the clock and reserve three minutes for rebuttal. The government did not present sufficient evidence to show that the boys here were in official detention pending deportation because the plain meaning of the statute means that the detention has to be connected to an actual order of removal. And there was no testimony... Well, that's the question. That's not the answer. I mean, that is the answer you would like, but that is the question. And the word pending, as I understand it, is not defined in the statute. Am I right about that? That's correct, Your Honor. So we look for the plain, the ordinary way that we would use pending. Yes. Do you agree with that? Well, when a private lawyer is appointed to the court, the lawyer might say, I'm not going to take any new clients pending my Senate confirmation. And the lawyer would say that even if she never ends up being nominated and the process is ongoing with that as the hoped-for result. So why wouldn't that be the same here once the process is set in motion? I mean, that's sort of the only reason why these young people are in detention at all. They're not just random kids off the street. They're people that the government is deporting. Well, the problem with that, Your Honor, is that wasn't the trial was that these boys were at Casa Cocapelli because they were awaiting reunification with a sponsor in the United States. But there's not a connection between the detention and the deportation. At least there wasn't any evidence that the government presented in its case. But is this is this a factual question or is it really just a legal question as to what pending deportation means and whether it has to mean actual removal, as you say? Well, there's both a factual and a legal component here, Your Honor. The legal component is, you know, the interpretation of the statute. And the factual component is whether the government presented sufficient evidence to meet whatever the statute requires it to meet in order to lose jurisdiction. And so in answering, if Judge Bress is satisfied with that response, I wanted to follow up on it, if I may. If pending deportation does not require a final order of removal, that is, if we disagree with your specific understanding of the factually about why the removal process had not been set in motion sufficiently as a factual matter with respect to these boys. Well, Your Honor, if I may, I think I have a better, a stronger argument than that for why why Mr Pacheco should prevail here. And that's this. The detention still has to be pending deportation. There has to be a causal connection, some sort of relationship between the detention and, as we agreed to talk about it, the detention and the removal proceedings. And here, the government didn't present any evidence that there was a connection between detention and the removal proceedings. The, the, the, the, the, the, the, the Isn't, isn't the whole, isn't the whole reason the boys were detained? Because they had been picked up by authorities and then notices appear, to appear, had been issued through our immigration processes? The whole reason that these boys were at Casa Cocapelli, Your Honor, that they were being, they were awaiting reunification with a sponsor or a foster family in the United States. Their removal proceedings could be ongoing even while they're in a foster home or living with a relative in the United States. The, the, the detention But you're arguing that they weren't detained. They were in fact detained, correct? They were not free to leave. They were not free to leave. Right. Okay. So they were detained. So that piece of it is answered. That's right. I'm not, I'm not, I'm sorry. I'm sorry for there to be some echo. I'm not contesting the claim. I'm just, the government had mentioned was related to the detention. And instead they presented evidence that the detention was related to finding a foster family or a relative for these kids. And that is not, that is not I'd like to turn to the end of the case now and talk about the sentencing and reassignment issue. The ninth sentence that the judge imposed here is both procedurally and substantively unreasonable. You're going to have to speak more loudly again. I'm sorry to have to keep interrupting you about that. It's not your fault, but it's quite hard to hear you. Okay. So is this better, Your Honor? Yes. Thank you. The 19 year sentence was procedurally and substantively unreasonable because the judge in explaining his sentence made a number of factual misstatements about the trial evidence and how HIV was treated in 2019. And his ability, his decision to base the sentence on these misapprehensions should give the court strong pause about whether he can be fair if the sentences were made. You understand that in our circuit, unlike other circuits, we almost never reassign to a different judge. There has to be something extremely unusual about the case. And the thing that I think is extremely unusual here is that the judge in explaining the sentence completely misstated the trial evidence. He said that Mr. Pacheco had exposed these boys to HIV. There was no evidence of any HIV exposure at all. And he said that it was a death sentence, which is right straight out of 1980s. HIV is not a death sentence anymore, and it hasn't been for almost 25 years. Was there any question but that he had HIV? No, everybody knew that he had HIV, but the jury did not know that because the judge excluded all evidence of his HIV status from the trial. And was the judge successful in that endeavor? I don't follow your question, Your Honor. Was the judge successful in trying to keep that information away from the jury? Yes, it was. There was no mention of his HIV status at the trial. But the judge said two important things about why he was exposing the boys. He said that Mr. Pacheco had exposed the boys, horrible, when there was no evidence of any exposure at all. And he said that Mr. Pacheco was reckless, without any evidence that Mr. Pacheco could prevent the spread of HIV, or without accounting for the fact that there was no exchange of blood or semen in any of the events at all. In fact, seven of these accounts involved over-the-close touching. So this hyperbole from the judge means that the sentence is based on non-sexual intercourse, and it's so egregious that in order to maintain the appearance of fairness, the court should remand with reassignment to the defense. And if I may, I'd like to spend a few minutes talking about the Dahlberg issue. This issue boils down entirely to the harmlessness. And that's because only this sort of metric of harmlessness involves whether there was actual Dahlberg satisfaction on the record, the relevance and the reliability of the witness's testimony. The record does not establish that Ms. Dutton's testimony was relevant or reliable. The judge never required the prosecutors to explain how her proposed testimony related to the facts of the case. And in fact, they kept saying over and over again that her testimony was more reliable because it was not connected to this case. But the Dahlberg disability standard plainly requires that there be some connection between the expert opinion and the facts of the case. The judge also said that Ms. Dutton should testify because she was experienced, but this doesn't matter how many times an expert has testified in court, each time the expert testifies, her testimony must be vetted according to the Dahlberg standard. And the other metric of harmlessness here is whether the erroneously admitted testimony had an effect on the jury. And we know that it did because the prosecutors presented the testimony in order to show that these victims were victims. The prosecutor said that during the sidebar before Ms. Dutton started testifying, and the prosecutor reiterated that in her rebuttal closing argument. Ms. Dutton's testimony was presented solely for the purpose of encouraging the jury to believe these words. They were perfectly articulate. They explained what happened to them. They explained the circumstances of their disclosure. The expert testimony was not. So it should have been under either Rule 602 or Rule 403, and this court should vacate the convictions and remand for a new trial at which the expert testimony will be properly vetted. And if there are no further questions, I will reserve the balance of my time. Thank you. You may do that. We all hear next from the government. You may begin whenever you're back in focus. There you go. Are you muted? We can't hear you. Now we can hear you. Terrific. Thank you, Your Honor.  May it please the court. I'm Peter Kozinets representing the United States. The convictions in the sentence should be affirmed for at least three reasons. First, the trial evidence contained substantial testimony showing that these victims were inofficial detention pending deportation. Second, the expert testimony of Dr. Dutton was properly admitted. And third, the sentence was procedurally proper and substantively reasonable. With respect to the evidence trial on detention and deportation, the government's immigration expert, Mr. Albert Goldman, a 40 year veteran of the INS and then the Citizenship and Immigration Services, testified without objection and without any sort of without being controverted that he had reviewed the victim's immigration files, each of them, that they had each been arrested for immigration violations for that. They had each also received notices to appear at their removal proceedings. These notices are the official charging documents which set forth their charges of removability, that they were all in these proceedings, that they had been set in motion and that because of all of that, they were pending deportation. He also testified that those proceedings would not terminate until these victims were actually deported from the country or their cases were dismissed. Mr. Kuznets, I understand you have a pretty strong argument on the notice, once a notice to appear has been issued. Where do you think it begins? In other words, if the boys had been apprehended, let's just say just north of the border and then had been immediately taken to a detention facility and before there had been any processing of them, would that be pending deportation too? Well, I'm just trying to figure out when does pending deportation begin? Because even if it is met here, I guess I'm thinking about other cases where this may come up. Sure. So the common understanding of the word pending, as Judge Graber pointed out, is this notion of something that might happen in the future, but hasn't yet come to pass and might never come to pass. And I suppose that once an immigrant is arrested, it depends really why they're arrested. If they're arrested because they're about to be charged with an offense of removability with not being in the country lawfully, then it's possible, Your Honor, that that may trigger this, provided that they're put into detention following that arrest. But even apart from that, under the facts of this case, the trial evidence in this case, it's abundantly clear that these victims were all in removal proceedings and were not in detention. Do Your Honor have any further questions on this issue of pending deportation? Well, you know, sometimes we say things are pending only if they're inevitable. You know, a pending real estate sale until you get to the closing next Tuesday, there's no real expectation that it could fall through. So it seems to me there is some ambiguity there and what does the legislative history tell us about what Congress was trying to accomplish? Sure. So the legislative history on this particular provision is relatively scant, but if we look to the structure of the statute and its object and purpose, those provide additional mutually reinforcing indications that this term isn't meant to be given the incredibly narrow definition that the defense suggests. So the statute of conviction is the Sexual Abuse Act of 1986. And the statute applies very broadly to any place where people are held in detention pursuant to a contract with the head of any federal agency or department. So it applies broadly to federal detention facilities writ large. And the definition of official custody is similarly painted with a very broad brush, encompassing large, encompassing a very sweeping number of detainees. People who've been arrested, charged, convicted of an offense or pending, as in this case, deportation. And when you kind of compare that to the trial evidence, you see that the evidence here, the undisputed evidence that they had been arrested, they had been charged, they'd been placed into proceedings, that the proceedings wouldn't end until they were actually deported. All of that strongly supports this construction of pending deportation. What is the response? I'm sorry. Go ahead. Finish that and then I have a second question. Sure. The object of the statute was clearly recognized in the Moop Hajib case from the Ninth Circuit, which is that Congress was expressing the strong federal interest in federal detention facilities, including the prevention of sexual abuse in those facilities. And clearly applying the statute here furthers that object and purpose. My follow up question was what your response is specifically to counsel's argument that these boys were actually awaiting release to relatives and that they were not headed for deportation. Sure. So I think the best way of looking at that is to look at under what circumstances could they be released from this detention that they're indisputably in. And as Mr. Goldman testified, their proceedings, their removal proceedings, would end in one of two things, actual deportation or dismissal of the case. Obviously, if their cases progress to actual deportation while they were still in custody in detention, that would be the end of their detention. They would be gone. If earlier than that, the Office of Refugee Resettlement is able to find a safe and suitable sponsor, they might be released earlier to that sponsor. So really, they're in detention pending the earlier of their actual removal from the country or their relationship to a sponsor. And that said, that's one way of answering the question. Another way of answering it is that the statute doesn't require a causal connection between the detention and the pending deportation. It's enough. We contend that there is a coincidence of these two things. They are indisputably detained. They are indisputably in removal proceedings that will only end upon their actual deportation or dismissal of the case. So whether you require a causal connection or not, there is sufficient evidence in the record to support the verdict here, particularly when viewed under the very supportive standard of Jackson versus Nevels, which requires us to construe any potential conflicts in the evidence in the light most favorable to the verdict. So unless there are any further questions on pending deportation, I'd be happy to address the omission of the expert testimony. One overarching point really stands out, and it's that the thrust of Dr. Dutton's testimony was that children involved in sexual abuse are commonly observed to have a history of sexual abuse. Certain issues with how they disclose the abuse, the disclosure can occur in a piecemeal fashion, in a delayed fashion or a partial fashion. That central thrust of her testimony has been well accepted by court in case law dating back for the last 30 years. So beginning with the Hadley and Antone cases in the early 1990s through Bighead and then brought it in 2003, and then more recently in the Young, Nation and Charles cases, those three recent cases being unpublished, the court has consistently recognized that this kind of testimony is probative and relevant and is not subject to exclusion under Rule 403 on grounds of vouching or bolstering. So the case law is clear on those points. The third point that I want to make here is that Dr. Dutton was eminently qualified. In fact, she is arguably the most qualified person to address this subject matter in the state of Arizona. For nearly 30 years, she has served on the state's Children's Justice Task Force, which is an office run out of the Governor's Division of Women and Children. She travels around the state training child protective service workers and law enforcement officers on how to do this, how to interview child witnesses and victims, particularly in cases involving child abuse. She also, on a day to day basis, practices in this area and has, over the course of her 30 year career, conducted more than 10,000 such interviews, the majority of which have involved issues of sexual abuse. So she was the thrust of her testimony is very well accepted. The defense never really took issue with that thrust of the testimony, and she was eminently qualified to deliver it. The defense talks about harmless error and whether the testimony sufficiently addressed the facts of the case. I would respond, Your Honors, by pointing out that her testimony became relevant to the facts of this case once the defense cross examined all of the victims on issues they had with how they disclosed the abuse. So with with respect to delays or partial disclosures that were experienced in this case. And again, that's consistent with the 30 years of case law that I've just referred to. In all of those cases, this court has recognized that this kind of testimony is relevant. The other. So the final point on harmlessness is that the the court can, if you determine that there was any error, any abuse of discretion here, the court can find on its own, based on the substantial record that this witness was qualified and provided reliable expert testimony in this area. And alternatively, the court can find harmlessness because this testimony comprised just a very small slice of all of the testimony presented in the trial. And it more likely than not, did not substantially sway the jury. Again, the central thrust of her testimony wasn't really disputed. She was cross examined at length and. Putting aside her testimony, the jury heard compelling testimony from the seven victims. It saw the video of what happened at the detention facility on some of the nights when the abuse occurred. It was almost out of time. You're almost out of time. And I'd appreciate your response on the comments of the sentencing judge concerning Mr. Pacheco, Pacheco's HIV status. Thank you, Your Honor. So there are really two issues, whether the judge made any sort of clear error of fact and whether the sentence was substantively reasonable. There was no clear error of fact because there was evidence in the record to support the exposed one or more victims to potentially contracting HIV. And where does this come from? It comes from the admission of the defendant that he had the virus, which is a PSR paragraph 17. It comes from ER 1670, one of the memoranda on this issue, which discloses that upon arrest, which was just a few weeks after these allegations came to light, he looked very pale. And the officers mentioned that to him. And he said, I have high blood pressure and I'm HIV positive. The next thing that happened is that the residents of Casa Cocopelli were informed that the defendant was HIV positive and they were educated about how HIV is transmitted. They received a presentation from a center that specializes on these issues. After that happened, two children came forward, two victims who hadn't previously disclosed abuse, and they said, we would like to be tested and we have we would like to disclose that we have been sexually abused by this individual in his objections to the PSR. The defendant wrote that the victim in counts 10 and 11 was the only victim who could conceivably have been exposed to HIV. That's an ER 1686. And the government, in its response to those objections, wrote that HIV could have been transmitted to that victim pursuant to what happened in the case and that it's a potentially deadly disease for which there can be mandatory reporting in certain circumstances. So all of these facts taken together, we submit are enough to show that the district court didn't clearly err. And I think what's more important, though, if you look at his sentencing reasoning at ER 1616 to 1619 in particular, you can see that what really motivated the sentencing was the egregious breach of trust that this defendant visited upon these children who were being detained at the facility. And so you're out of time, and I think we understand your position. Thank you. With that, we respectfully request that you affirm. Thank you. And I believe you have just shy of three minutes for rebuttal remaining. Yes, thank you, Your Honor. I want to go back to the official detention issue, because one of the things that my friend in the screen below me has said is that the phrase, the plain meaning of the phrase detention pending deportation doesn't have a connection between the detention and the deportation or here the deportation proceeding. And that that's just wrong. The pending means awaiting. There has to be you're going to await the end of here. We've decided to talk about this on the premise that the thing that they're awaiting for while they're being detained in order for the government to prove that there's jurisdiction is that they're waiting for a decision in their removal procedure. But the government never addresses the testimony of the woman who runs this program for the Office of Refugee Resettlement, Valenzuela, who said these boys were in custody awaiting reunification with a sponsor. And if they turned 18 without having been reunited with a sponsor, it wasn't necessarily the case that they were going to go into ICE custody. But the end of the government showed at trial, the end of the detention had nothing to do with the end of the removal proceeding. And in this case, even if you look at the way the government is asking you through it, the government doesn't present sufficient evidence to know that there was federal jurisdiction. I have a comment about the legislative history and the purpose of the statute, which is simply all of the kinds of custody that are listed in the definition of official detention are for immigration related or federal criminal law enforcement related function. Casa Coca-Cola is a foster home and it's regulated by the state of Arizona. In fact, a couple of weeks after this trial ended, the state of Arizona tried to revoke Southwest Key's licenses because they weren't doing proper background checks. That's not the sort of thing that Congress is so uniquely focused on that it should exercise criminal jurisdiction when crimes are committed against people in these facilities. There's a federalism interest here that states can enforce both criminal laws against children in these kinds of facilities and Congress can just leave the federal interest for things that are for federal law enforcement or immigration related. And with that, I'll ask the court to reverse the conviction, vacate the sentence, or remand for a new trial in front of the district attorney. Thank you, counsel. The case just argued is submitted and we appreciate helpful arguments from both counsel. Thank you.
judges: Graber, Dawson, Bress